I'm James Tree, representing Mr. Davenport on this appeal of his denial of social security benefits. The administrative law judge in this case found that Mr. Davenport did not have a Step 2 severe mental impairment. We believe that the evidence shows that he did have a severe mental impairment and that therefore the judge's decision is not supported by substantial evidence and it was based on legal error. Could I just ask you what the import of that is? Usually you could just end right there if you believe there was no severe impairment, but the judge could go on to say and then go through the other steps. So in that case, even if we agreed with you, could you explain why it wouldn't be home there? Yes, because the ALJ did not give any mental limitations in his RFC. There were zero. He only gave physical limitations and so he didn't adopt... In the hypotheticals that they considered? In the hypotheticals that they considered and also in his formal residual functional capacity finding in his decision, which is the finding that the commissioner makes saying what the limitations that the claimant has are. So was that objected to, the hypothetical? Without the mental limitations. What happened at the hearing is that Mr. Davenport had just been in for an evaluation with his treating psychiatrist, Dr. Lee, who was really the first person that gave specific functional limitations and the judge kept the record open to receive that report as it was a current report at the time of the hearing. And so those weren't available to give to the vocational expert. The judge was asked at the hearing, a motion was made that he send Mr. Davenport for a psychological evaluation and he said he would wait until he saw Dr. Lee's, the treating psychiatrist's, report before he decided if he would send him for a psychological evaluation. Then after that, in his decision, he said that I've reviewed Dr. Lee's opinion, I give it little weight, I reject it, and I'm not going to send Mr. Davenport for a psychological evaluation. So here we are. Well, what's the import? We have Dr. Lee's report in March, is it? Yes. 2009, and she talks about a major depressive severe disorder. And then about two months later, in May, she basically says improved, less severe depression, alert cooperative pleasant, et cetera. That was at the appeals council. What do we do on that in terms of evaluation? I think it's kind of academic in this case because her opinion that she gave in March of 2009 was really a listing level mental impairment, a very severe impairment, where she said that he had no ability to perform or tolerate the expectations of a normal work setting. So her limitations were severe and marked. You only need to have marked. Severe exceeds marked in order to meet the listings. So it was a very severe impairment that she saw from when she started treating him in 2008 through 2009. By later in 2009, she said that it improved, but it still was a severe impairment. It was still a major depressive disorder, but an improved one and not as severe as it had been at the listing level. Did she say in the second report that it's a major depressive at that level? She said that it was less severe than it had been when it was at the listing level. She didn't actually quantify that. And so then the ALJ said with regard to the March opinion that he would give it little weight because it was based pretty much on self-assessment and it varied from the other assessments, such as the social worker. Is that sufficient grounds? We don't believe so. The Ganim case at this court clarified that it's not enough for a judge to reject a treating physician if the treating physician relies upon the self-reports of his patient. He has to more heavily rely upon the self-reports than he does his own professional judgment and clinical observations. Mr. Tree, what do we do with your client's repeated comments that he did not himself think he was severely depressed and that, in fact, he was improving with medication? Where does that fit in this? I think as you read through the longitudinal record, you can see that that is a reoccurring theme in this case, is that Mr. Davenport in 2002 developed a life-threatening illness where he was hospitalized for a couple months, put in an induced coma, nearly died. His family was called to the hospital to say their last respects to him. He was put on social security disability with a listing-level impairment. As you read the record, you see this guy's a worrier. He worries about everything. He worries that he's not going to have a place to live. He worries that he's putting an undue burden on his family. He worries that he used to be a good worker and was in the military and worked in labor, and he can't support himself any longer. He doesn't know where his next food's coming from. He doesn't know where he's going to live. He continually worries. And so several providers have indicated that, Your Honor, that as a result of that, they have diagnosed him with an anxiety disorder. And the Seattle Veterans Administration, when he was, or excuse me, not Seattle but Alaska, before he started treatment with the Seattle VA, and before he got into the VA, I should say he didn't have medical insurance. Once he got, once social security took him off of disability, he no longer had medical insurance. So he got in with the Veterans Administration, and they started to treat him in Alaska when he was up in Alaska. And he had an interdisciplinary team in Alaska that was chaired by a psychiatrist, Dr. Johnson. Dr. Johnson said he's got an anxiety disorder that's secondary to his medical condition. He was told he had sudden death syndrome. And so for some people, they may read up about that and realize, well, okay, I might die suddenly, but I probably won't. But for him, he's a worrier. It just worried him to death. He had an incident in 2006 where he was driving, became lightheaded, and nearly fainted while he was on the freeway. Scared him to death. He hardly drives. He doesn't fish anymore. He loved to fish. He was an outdoorsman. He was a tank crew member. He doesn't do those things anymore. His activities of living are markedly diminished. Now, the judge said that he was they were that made him not credible, because his cardiac impairment should not impose such limitations. But what the judge did not address and did not discuss in his decision was that his own medical expert, the cardiologist, said there are substantial psychological matters in this case. He did not indicate there was any secondary gain, that there was any malingering. His own treating cardiologist, Dr. Lehman at the VA Medical Center, who said that he didn't believe that the cardiac condition was as severe as Mr. Davenport felt it was, said, but his symptoms are consistent with anxiety. The judge gave both of those cardiologists significant weight. He did not reject either one of their opinions regarding anxiety or regarding substantial psychological impairments. In fact, he failed to discuss any of that. So what we see here is a situation where an- I have a question on that. I read those as primarily cardiac evaluations, and they weren't necessarily trying to put a quantification on his anxiety. Like Dr. Lehman said, he didn't really see an objective basis for this cardiac disability. And then his other doctor, Garrett, said three months' disability. But I didn't-I'm not sure why it would be an error for the ALJ to not necessarily then say, oh, but they all talked about anxiety. I'm not quite sure how that fits in when they really are cardiac doctors. Because there's a term that's called cardiac cripple, where an individual has a significant cardiac event, and then they become so scared and so worried about the situation that they cripple themselves. And it can turn into a psychological impairment. And there's evidence in this case that it in fact did. Dr. Johnson, the psychiatrist at Alaska VA, diagnosed Mr. Johnson with an anxiety disorder secondary to his medical condition. That same diagnosis was also given by Dr. Margaret, an MD PhD at the Seattle VA. She said that he has 401, that he has ongoing anxiety associated with his medical condition. Ms. Galt, his counselor, mental health counselor, said he has this anxiety disorder that's secondary to his medical condition. Rita Webb, his counselor at the VA, said that he is a cardiac cripple at page 460 in the record. Dr. Thompson, who the judge-and none of these opinions the judge didn't talk about. I guess we'd be having a different conversation if the judge had discussed Rita Webb's comments, Ms. Galt's comments, Dr. Margaret's comments, Alaska VA psychiatrist's diagnosis of anxiety secondary to his medical condition. But the judge never considered that. He never weighed that issue. He never considered that this man, nobody said this man had secondary gain. Nobody said this man was malingering. They all acknowledged that he's got substantial psychological impairments. And this began in 2006 and 2005 by his treating physician, Dr. Dauber, who diagnosed him with anxiety and depression back in 2005 and 2006. So this is not a short-lived couple-month period of time. This is a lengthy period of time. What would be the remedy in that case? Well, the remedy in that case, I think, would be to remand for additional proceedings, except in this case we believe that Mr. Davenport is credible, that the judge gave improper reasons for rejecting his credibility. When we credit his testimony, the vocational expert said that he did listen to his testimony, and based on if it was credited that he would be unable to perform any work, and he gave some detailed reasons of why he would not be able to sustain work. And so I think the record is well-developed. If Mr. Davenport is credible, that appropriate remedy would be to remand for immediate awarded benefits based on that. If the credibility determination is determined to be supported by substantial evidence, then what avenues do you have? Then there's many errors that the ALJ made that we believe cumulatively are not harmless and that the matter would need to be remanded for additional proceedings. So getting back to your question, Your Honor, about Mr. Davenport's feelings, he did not feel he had a mental impairment. It's true. That's significant because the judge said that I reject Dr. Lee, the treating psychiatrist, because she listened to Mr. Davenport, who was saying, I don't have a mental impairment, I'm not depressed. That's quite the opposite of when we have a case where a claimant comes in and says, I'm terribly depressed, and the judge says, but you're not credible, and therefore I reject your doctor because he believed you when you're not credible. We have just the opposite in this case. We have a man that doesn't feel he has a mental impairment, but we have a very trained, seasoned psychiatrist from the Veterans Administration that saw past that. The Veterans Administration actually gave objective testing that confirmed that he had a depressive disorder. His friends and his family had told him for years, you've got to get counseling. You're not right. You're depressed. He didn't believe it. He didn't buy it. He says, no, my problem is from my orthopedic problem and my cardiac problem. Now, as to his orthopedic problem, I think that's an important aspect of the case that is going to require at least remand for additional proceedings. And I say that, Your Honors, because what happened at the hearing was that the judge took his cardiologist, Dr. Gerber, and he said to Dr. Gerber, he said, now, quote, in terms of the degenerative disc disease, what limits? Well, let me ask it a different way. You've been provided a light RFC by DDS in the record. Would you agree or disagree with that? DDS is a state agency consultant. And the state, the cardiologist said, Judge, are you referring to exhibit 4F? Is it 4F? The judge said, yes. He says, yeah, I agree with 4F. 4F, that's an important, and it's a fatal flaw in the judge's decision, because he says that this is from a medical source, the state agency consultants, which normally are. But at this time, Social Security decided to do a pilot project, and Washington State was one of the states where they didn't use medical experts, doctors, or even a PA to evaluate these claims. The person that evaluated that claim at 4F was Steven Siegel, and it's in the record at 299. This is the initials WASDM. I wanted to point out that you don't have much time left if you wanted to rebuttal, but you're welcome to take it on now. Okay. I better take it, because I'm on a roll. Washington State is a single decision maker, and this is not a medical doctor. This doctor had reviewed 28 pages of record. Twenty-five of the 28 were pre-onset date records. They weren't even considering his time. He led his medical expert, who was a cardiologist, to 4F, saying, do you agree with 4F? He says, yes, I agree with it. Then he says, I reject the providers that have given him limitations with hands because he has no radiculopathy. If you look at page 283, that's where the judge gets his opinion that he has no radiculopathy. It's a report in 2006 that's referencing a study that was done the year previous in 2005. But what's so fatal about that case is on 283, the orthopedic surgeon diagnosed him with cervical radiculopathy on that very day that the ALJ said there's no evidence in the record he has radiculopathy. The judge only got partway down that chart note where it said that he doesn't have radiculopathy from a year period the previous year when a study showed he didn't. His condition worsened, and by March of 2006, he had radiculopathy. After that, there's 12 other references in the record about radiculopathy, all of them saying that he does have radiculopathy. The judge's finding was, I find him not credible because he doesn't have radiculopathy. Therefore, he doesn't have hand impairments. Therefore, he can do the only jobs that were identified were jobs requiring frequent and constant bilateral hand use, a fatal error in the decision. Thank you. Thank you, Your Honor. Good morning, Your Honors. Your Honor, David Burdett, representing the Acting Commissioner of Social Security. I think there are kind of two broad categories here. The physical impairments and then the alleged mental impairments that are pretty much based on the opinion of Dr. Lee. With regard to the mental, as Judge McEwen pointed out, Dr. Lee's opinion is kind of questionable for support of a finding of disability for Social Security purposes because just a few months later in May of 2009, she says, oh, he's much improved, his mood is improved, he's alert, cooperative, pleasant, et cetera. And being that that evidence is now in the record post-bruise, we have to consider that. We can't just wave it away. Now, I think that the opinion, I was not clear, and I don't want to mischaracterize what Jim said, but I think at one point he was characterizing the contradictory opinion to that of Dr. Lee as being from a social worker, and that was not the case. The ALJ also relied on Dr. Margaret, who was referenced, who was one of Dr. Lee's BA psychologist, psychiatrist colleagues. She's an MD, PhD, I believe. And Dr. Margaret characterized Mr. Davenport's mood limitation as dysthymia, that is mild depression. She said that his memory is intact, he has good attention, good ability to concentrate, et cetera. The word mild keeps coming in, but is that in her report? Dr. Margaret does not say mild, no. I'm characterizing dysthymia as mild. But I think it's important to make that distinction because it permeates the briefs, and she never said the word mild. She said that he reports anxiety, panic attacks, et cetera, calm, normal at that time. I'm just wondering, what does she do for the calculus, one way or the other? I just don't know, Your Honor. Okay. I don't know that. I have to kind of rely on the conclusions that they give me because the science of it all is kind of a black box to me, except to the extent that there are or are not. We have his treating physician who says he has this severe depressive. And then we also have a very odd statement by the ALJ, something to the effect of, well, you can't really count on treating physicians often because they sometimes, in effect, get a little bamboozled by or close to their clients and patients, and so that's a problem with treating physicians. And that kind of statement seems totally at odds with how you're supposed to start out in terms of your treatment, treating physicians. And I'm wondering if that doesn't infuse the ALJ's view here. Well, I don't know, Your Honor. I don't know whether it does. If it does, that would be a flaw. I would like to think that it does not. Do you think it would be appropriate here to remand because just to put on the table that that approach is actually contrary both to the Social Security regs and Ninth Circuit precedent? Well, I don't think so because we still have to, bracketing the rightness or wrongness of that statement, I think we still have to deal with the facts of the case. And I think the facts of the case suggest that the ALJ concluded for good reasons, whatever else he may have been thinking about the treating physician at the time and how you deal with them, he concluded for good reasons that this gentleman was still able to adjust to work. The business about him being a cardiac cripple, so-called, clearly it is true that there's a common thread running throughout the case that he has anxiety, anxious mood, or depression. However, it's rightly to be characterized. And that waxes and wanes over time, apparently, depending on who's seeing him and what he has to say about his mood at the given time throughout the record. And throughout 2008 and 2009, particularly, that goes back and forth. But if you look at what is happening with him, Dr. Lehman, who's his treating physician, his physical treating physician, doesn't find any limitations that would be vocationally relevant. Dr. Gerber, the ME, believes that he doesn't have any limitations or pain, speaking of the radiculopathy, that would have any severe vocational impairment. He can work, the ALJ rationally concluded. And the ALJ finds him not credible. And this is not to say, as we know, that everything that a man says is wrong because an ALJ makes a credibility determination in these social security cases. The ALJ has to make a credibility finding, and he has to find that it's not entirely credible, or else he has to believe everything that the claimant has to say. He found him not credible not only because of the business with Dr. Lee and Dr. Margaret, but because he performed activities that were not consistent with being disabled. He was up in Alaska caring for two children, his nephew's children. One was a 5-year-old, and one was an 18-month-old toddler for a month. And that's not consistent with an inability to bend down, lift up weights, carry things around, et cetera. There was this introduction by Mr. Davenport into the record of a statement that, oh, 20 times the paramedics came out and saw me, but there were no records to that effect. The relatively light treatment where he allegedly has a back problem. He certainly has a back problem, but he allegedly has a disabling back problem, back and neck problem. But there's no evidence of that on the X-rays and the EMGs. And then he says, no, I don't want to undergo surgery. I don't want to have an epidural injection. So light treatment, activities of daily living that he performs during the time of disability, inconsistent statements, these are all the kinds of reasons that are validated in our jurisprudence for an ALJ finding a person not completely credible as to the extent of his allegedly disabling symptoms. So I think that this is a case where the ALJ looked at it, didn't believe him. He did not believe that Mr. Davenport was as disabled as Mr. Davenport thought. That's what ALJs do, respectfully. That's the conclusion that they come to. Sometimes they believe everything that the claimant has to say, or sometimes they believe enough that the claimant has to say that they find them disabled, and sometimes they don't. And our mission is to look when we put a check in the reviewing court on whether the ALJs did it right, our mission is to look at whether they introduced enough good reasons that the determination was adequate. And I would respectfully submit that it is. And what is the standard of review for the sufficiency of the reasons that they introduced? That's a thicket, Your Honor, because there has been for a long time in the Ninth Circuit a clear and convincing standard. Now, the agency takes the position that clear and convincing was introduced erroneously and was misleading. And we would like to insist on the standard in Bunnell that dates back to 1996, that the standard should be adequate reasons that persuade the court, the reviewing court, that the ALJ did not arbitrarily dismiss the claimant. But I would suggest that under any standard, because all of the cases that uphold the clear and convincing standard have been, all the cases that introduce the reasons, the categories of reasons that I've been talking about, cling to the clear and convincing standard. So I would say that under any standard there is, in all jurisprudence, the ALJ cited adequate reasons. The one area that's troubling also is this Stage 2 or Step 2 analysis, because the time the ALJ makes that analysis, he has Dr. Lee saying that you have a major depressive disorder, and you don't have the later Dr. Lee testimony yet. So counsel says, well, that's not really harmless because when you go down into the other steps, then you're really missing the mental component of the hypotheticals and the analysis. And I'd appreciate your comments on that. I understand the argument. The argument is that if the ALJ doesn't agree that this is a severe limitation, then he's missing a key factor in this man's whole makeup that impacts everything that he does later on. But I disagree because the ALJ addressed the opinion of Dr. Lee. And, you know, if he had ruled the case out because, oh, well, you don't have any severe impairments at all, and just full stop, that's the end of it, then that would be wrong. He addressed the opinion of Dr. Lee, which he didn't agree with. Now, if later on you determine that he did not adequately encompass the opinion of Dr. Lee, well, that's part of the reviewing court's job, and I understand that. But to say that at Step 2 the case is lost, I can't agree with that, because Step 2 exists, as you know, only to screen out cases that don't have any severe impairment at all. He found that he had multiple severe impairments, so he goes on and, in theory at least, Step 2 is over, now we go on and look at Step 3, whether he meets the listing, and then Step 4 and 5, whether he can go back to pastoral work or just to other work. If there is a severe impairment in Step 2, as there was, then the ALJ goes on and reviews all of the impairments and all of the medical evidence of record. Now, that doesn't completely answer the point of whether he did satisfactorily review all the evidence of record, but I think that it's not a Step 2 error for sure. I would like to, if there are no other questions, I would like to say one thing, and actually Jim didn't even bring it up, but I want to. There was a finding at Step 4 and an alternate finding at Step 5. We're not relying on the Step 4 finding, and the reason is that the Step 4 finding was that he could return to pastoral work as a night watchman or something of the like that he did at a logging company 15 years prior to the ALJ's decision. Under the regs, the pastoral work has to have been within the last 15 years, and that's 15 years prior. Right, standing by itself, that would have been error. Correct. But what's your response? Well, my response is only that we are relying on the alternative Step 5 finding, Your Honor, that he did make. But I just wanted to clarify that the Step 4 finding is an error, and we're not relying on that. Okay. Is there no further questions? There's no further questions. Thank you. Thank you, Your Honor. Thank both counsel for your arguments this morning. The case of Davenport v. Colvin is submitted.
judges: O'scannlain, Ebel, McKeown